## WILL STEPHENS V. THE STATE.

No. 20539. Delivered November 1, 1939.

The opinion states the case.

*Newland, Cornett & Whitworth,* of Linden, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, Judge.

The offense is theft of cattle; the punishment, confinement in the penitentiary for two years.

The indictment charged, in substance, that on the 28th of August, 1938, appellant and Joe Hill stole one head of cattle from Henry Hughes. Isaac Hughes, a son of the injured party, testified that prior to the loss of his father's heifer he had placed her in a pen near the house. The following morning he found that she was gone and instituted a search for her. At this juncture we quote from his testimony, as follows: "After I missed the cow I began to search around, thought maybe the cow was in the field, and I went all the way around the pasture and could not see where she got in the field. And I began to look to see what had become of her, and I finally came up on a track, looked like somebody had been running her. And I tracked her on and I seen some men tracks, and I

followed the track on down to where they carried her through the fence, pulled up a post and let the wire down. A post was pulled out of the ground. The men's tracks followed along with the cow tracks, and I could see them plain on the ground. Then they went on through into Zeke James' pasture, and I went on down through the pasture trying to follow the track on, and seen a wagon track where they come into the pasture, and after I found that track I tracked it to where it went back out of the pasture, and tracked it on as far as Cornett, Texas. When I got there I inquired whether anybody had seen a wagon pass there, and they hadn't, and Mr. McCord 'phoned the law for me." On cross-examination the witness testified that he found the stolen animal approximately two days after the theft in Jaybird Hill's pasture, which was about a mile from the pasture of witness' father.

Arthur Boyd testified that about the time that Henry Hughes lost a heifer appellant came to his home and borrowed his wagon but did not use the wagon bed. The witness said: "He come to my house about 10 or 11 o'clock and said he wanted to borrow my wagon to pick up this wagon (referring to a wagon which belonged to Mr. Hicks, who was appellant's landlord) and I said, 'All right.' And he stayed around there until about 12 o'clock and goes home and that afternoon he came back with a team and got my wagon, that was Sunday afternoon, about August, 1938. And he moved this wagon, and after he moved it then he came back by the house and told me he was going to take this bed off of this wagon over to Mr. Alonzo's, the bed off of the broken down wagon, and they went toward Mr. Hicks' and I don't know what time they come in, but I didn't see them or my wagon any more until Monday morning. I don't know what time of night they brought the wagon home but when I woke up Monday morning the wagon was back. He didn't use my bed on my wagon but just used the running gear of my wagon, and he moved the broken down wagon."

James Boyd, a witness for the State, testified that about the time of the loss of the Henry Hughes animal he agreed to buy a yearling from appellant. He said appellant came to his home with Joe Hill late in the evening prior to the loss of the Hughes animal in a wagon which he had borrowed from Arthur Boyd, and told him that he was going to get a yearling which belonged to his wife and deliver it to the witness sometime that night.

The State introduced appellant's voluntary confession, from which we quote as follows:

"About dark on last Sunday evening, August 28, 1938, Joe Hill and I left my house. I asked Joe did he want to go and get a heifer. Joe did not want to go and get the heifer at first, but he eventually consented. We stopped at Arthur Boyd's house and stayed there for about one hour, and after it began to get dark, we left and went to get the heifer. We were in a wagon. We agreed to get Henry Hughes' heifer after we left Arthur Boyd's house. I lariated the heifer with a rope and lead the heifer across the field to the wagon. We raised the wire fence up and got the heifer into James pasture. We then loaded her on the wagon where we had it parked and then drove with the heifer in the wagon and let her out and put her in the James Boyd pasture. Joe helped me carry the wagon, and team home and I then went and got my wife and I went home. We got home about 3 o'clock in the morning. I heard the evening afterwards that the law was looking for me, and I carried the heifer almost back home and turned her aloose. Joe helped me. He caught her. Henry Hughes did not give me consent to get his yearling or heifer. I had in mind to sell the heifer. I had spoke to James Boyd about buying the heifer. This was before I took the heifer. I did not pay Joe anything to go with me and help get the yearling, and Joe did not pay me anything."

Testifying in his own behalf, appellant admitted that he borrowed a wagon from Arthur Boyd and placed a bed on it which he had at his (appellant's) home. Further, he admitted that he went to the Henry Hughes pasture, took possession of the heifer in question, and delivered it to the premises of James Boyd. He testified, however, that his wife had a heifer in his father's pasture which was near the Hughes pasture, and that at the time he took the animal of Hughes he believed it belonged to his wife. Again, he testified that upon learning that he was mistaken he returned the animal to a point near the Hughes pasture. In short, the defensive theory shown in his testimony was that he acted in good faith and that upon learning he had made a mistake he attempted to restore the alleged stolen animal to the owner.

It was the State's theory that after appellant learned that the officers were about to apprehend him on a charge of theft of the Hughes heifer he returned the stolen animal in an effort to prevent arrest and prosecution.

It appears from bill of exception No. 1 that prior to the present trial appellant had been convicted during the same

term of court in a separate and distinct transaction involving the theft of chickens, and given a suspended sentence. The twelve jurors who sat in his trial upon that case were on the panel in the present case. Appellant made a motion that said jurors be disqualified by the court and removed from the panel. This motion was overruled. The court qualifies the bill of exception with the statement that appellant exercised only five challenges in striking from the list. The court was warranted in overruling the motion. We quote from Branch's Ann. P. C., sec. 558, as follows: "The fact that the jurors had convicted defendant in another case based on a transaction occurring between different parties than those involved in the case on trial is not of itself a ground of challenge for cause." In support of the text several authorities are cited, among them being Arnold v. State, 38 Tex. Cr. R. 1, 40 S. W. 734; Edgar v. State, 59. Tex. Cr. R. 255, 127 S. W. 1054.

Bill of exception No. 3 reflects that Bill Wilson, a constable, testified that he talked to appellant's wife shortly after the theft about a wagon bed which appeared to have been used to haul cattle, and that she said that it belonged to Mr. Hicks. In his qualification to the bill the court states that the testimony given by the witness was a voluntary statement and that the court immediately instructed the jury that it should not be considered by them for any purpose. We think, that, as qualified, the bill of exception fails to reflect reversible error.

A careful examination of the record leads us to the conclusion that reversible error is not presented.

The judgment is affirmed.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.